**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

SUSAN B. LONG,
DAVID BURNHAM, and
TRAC REPORTS, INC.

                Plaintiffs,

        v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, and
U.S. CUSTOMS AND BORDER
PROTECTION,

                Defendants.

Civil Action No.:    5:23-cv-01564
                     (DNH/TWD)

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S
MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

---

CARLA B. FREEDMAN
United States Attorney

By:    David M. Katz
        Assistant United States Attorney
        100 South Clinton Street
        Syracuse, New York 13202

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND .........................................................................................2

I.     The EID Contains Thousands of Potential Fields Of Data For Any Given Record And Data Pertaining To 20,000,000 Migrants. ..............................2

II.    Disclosure Of EID Data Would Increase The Risk Of Cyberattacks On The EID. .............................................................................................................2

III.   Individuals Can Be Re-Identified From EID Data. ...............................................3

ARGUMENT ...................................................................................................................3

I.     ICE's Estimate that it would take 8,360 hours to Comply with Plaintiffs' Operative FOIA Request is Unrebutted and Constitutes an Undue Burden under the FOIA. ................................................................4

II.    FOIA Exemptions Bar Plaintiffs' Request. ............................................................9

     A.    Plaintiffs Failed to Rebut ICE's Privacy and Safety Assessment, Which Underlies Exemptions 7(C), 7(F), and 6. .....................................................................................10

          i.    Exemption 7(C). .....................................................................11

          ii.   Exemption 7(F). .....................................................................13

          iii.  Exemption 6 ...........................................................................13

     B.    Plaintiffs Failed to Rebut ICE's Cybersecurity Assessment. ........................................................................................14

          i.    Exemption 7(A). .....................................................................14

          ii.   Exemption 7(E). .....................................................................14

     C.    Exemption 3. ............................................................................16

D.     Plaintiffs Failed to Rebut ICE's Reasonable Segregation Analysis ......................................................17

     i.     Exemption 3. ..............................................................17

     ii.    Exemption 6. ..............................................................17

     iii.   Exemption 7(A). .........................................................17

     iv.    Exemption 7(C). .........................................................18

     v.     Exemption 7(F). .........................................................18

     vi.    Exemption 7(E). .........................................................18

III.   Plaintiffs are Not Entitled to Summary Judgment. ...................................19

IV.    Plaintiffs Did Not Establish a Reason to Order Discovery Here..........................................................................................19

CONCLUSION .....................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*ACLU Immigrants' Rights Project v. I.C.E.*,
   58 F.4th 643 (2d Cir. 2023) ................................................................................... 9

*Ajluni v. F.B.I.*,
   947 F. Supp. 599 (N.D.N.Y. 1996) .............................................................. 19, 21

*Allnet Comm'n v. F.C.C.*,
   800 F. Supp. 984 (D.D.C. 1992) ............................................................................ 9

*Amnesty Int'l USA v. C.I.A.*,
   728 F. Supp. 2d 479 (S.D.N.Y. 2010) ................................................................... 6

*Amuso v. D.O.J.*,
   600 F. Supp. 2d 78 (D.D.C. 2009) ....................................................................... 13

*Anderson v. Bureau of Prisons*,
   806 F. Supp. 2d 121 (D.D.C. 2011) ..................................................................... 13

*Beltranena v. Clinton*,
   770 F. Supp. 2d 175 (D.D.C. 2011) ..................................................................... 20

*Bloeser v. D.O.J.*,
   811 F. Supp. 2d 316 (D.D.C. 2011) ....................................................................... 6

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
   769 F.2d 919 (2d Cir. 1985) ................................................................................. 19

*CareToLive v. F.D.A.*,
   631 F.3d 336 (6th Cir. 2011) ..................................................................... 3, 19, 20

*Carney v. D.O.J.*,
   19 F.3d 807 (2d Cir. 1994) ............................................................................. 3, 20

*Durrani v. D.O.J.*,
   607 F. Supp. 2d 77 (D.D.C. 2009) ....................................................................... 17

*Gonzalez v. I.C.E.*,
   475 F. Supp. 3d 334 (S.D.N.Y. 2020) ................................................................. 13

*Heily v. Dep't of Comm.*,
   69 F. App'x 171 (4th Cir. 2003) .......................................................................... 20

*Jarvik v. C.I.A.*,
   741 F. Supp. 2d 106 (D.D.C. 2010) ..................................................................... 19

*Keys v. D.O.J.*,
    830 F.2d 337 (D.C. Cir. 1987) ...................................................................... 11

*Lane v. Dep't of Interior*,
    523 F.3d 1128 (9th Cir. 2008) ..................................................................... 20

*Lazardis v. Dep't of State*, 934 F. Supp. 2d 21 (D.D.C. 2013) ................................. 14

*Lead Indus. Ass'n v. Occupational Safety & Health Admin.*,
    610 F.2d 70 (2d Cir. 1979) .......................................................................... 17

*Lewis v. D.O.J.*,
    867 F. Supp. 2d 1 (D.D.C. 2011) ................................................................. 12

*Long v. I.C.E.*,
    149 F. Supp. 3d 39, 55–58 (D.D.C. 2015) ...................................................... 4

*Long v. I.C.E.*,
    464 F. Supp. 3d 409 (D.D.C. 2020) .............................................................. 19

*Loving v. D.O.D.*,
    550 F.3d 32 (D.C. Cir. 2008) ...................................................................... 17

*McGehee v. C.I.A.*,
    697 F.2d 1095, 1102 (D.C. Cir. 1983) ........................................................... 4

*Nat'l Archives & Recs. Admin. v. Favish*,
    541 U.S. 157 (2004) .................................................................................... 11

*New York Legal Assistance Group v. Bd. of Immigration Appeals*,
    987 F.3d 207 (2d Cir. 2021) .......................................................................... 9

*Peter S. Herrick's Customs & Int'l Trade Newsl. v. C.B.P.*,
    No. 04-00377,
    2006 WL 1826185 (D.D.C. June 30, 2006) ................................................... 13

*Raulerson v. Ashcroft*,
    271 F. Supp. 2d 17 (D.D.C. 2002) ............................................................... 13

*Reich v. D.O.E.*,
    784 F. Supp. 2d 15 (D. Mass. 2011) ............................................................. 20

*Reporters' Comm. v. C.B.P.*,
    567 F. Supp. 3d 97 (D.D.C. 2021) ............................................................... 17

*SafeCard Servs. v. S.E.C.*,
    926 F.2d 1197 (D.C. Cir. 1991) .................................................................... 7

*Schaerr v. D.O.J.*,
  69 F.4th 924, 929 (D.C. Cir. 2023) ................................................................... 3

*Shays v. F.E.C.*,
  424 F. Supp. 2d 100 (D.D.C. 2006) ................................................................ 19

*Skinner v. D.O.J.*,
  893 F. Supp. 2d 109 (D.D.C. 2012),
  *aff'd sub nom.*,
  *Skinner v. A.T.F.*,
  No. 12-5319,
  2013 WL 3367431 (D.C. Cir. May 31, 2013) ................................................ 16

*Solar Sources, Inc. v. United States*,
  142 F.3d 1033 (7th Cir. 1998) ........................................................................ 17

*Sorin v. D.O.J.*,
  758 F. App'x 28 (2d Cir. 2018) ...................................................................... 17

*Span v. D.O.J.*,
  696 F. Supp. 2d 113 (D.D.C. 2010) .................................................................. 3

*Wolf v. C.I.A.*,
  569 F. Supp. 2d 1, 9 (D.D.C. 2008) .................................................................. 4

**Statutes**

5 U.S.C. § 552(a)(2) ............................................................................................. 9

**Regulations**

6 C.F.R. § 5.4(i) ................................................................................................... 8

## PRELIMINARY STATEMENT

Plaintiffs' opposition is full of implication and innuendo but devoid of substance. The bulk of Plaintiffs' ungirded and bare arguments appear in Plaintiffs' Memorandum of Law. The only declaration Plaintiffs submitted came from Susan Long, who has "no actual working knowledge of the EID, its data, or how it is actually used." Gibney Reply Decl. ¶ 7.

The Long Declaration fails to raise a genuine question of material fact because the facts disputed are not material and the disputes are not genuine. First, Long wrongly claims, based on outdated information, that ICE materially overestimated the tables and data fields in the EID. Gibney Reply Decl. ¶ 14. However, even using Plaintiffs' incorrect claim that "the EID contains 849 tables and 9,279 data fields" (Dkt. # 47-13), ICE's undue burden argument would still stand. Second, Long is mistaken in claiming she has received (1) case-by-case data (2) from the EID via ICE FOIA responses before. *See* Gibney Reply Decl. ¶ 11. Those productions did not come directly from the EID, as Plaintiffs request here. *Id.* Third, Long implies ICE's previously produced unredacted fields from the EID without objection. Plaintiffs' current request is quantitatively and qualitatively broader than their previous FOIA requests to ICE. Plaintiffs now seek "all datapoints (from any time) directly or indirectly linked" to two sets of individuals with all relational information preserved and code entries. Dkt. # 40-3 ¶¶ 7-8. ICE explained how Plaintiffs' request raises grave privacy, safety, and cybersecurity concerns. Plaintiffs failed to dispute these concerns on the merits, and instead opting for unsworn statements and unsupported argument.

Plaintiffs' opposition to ICE's reliance on several FOIA exemptions fare no better. ICE submitted detailed declarations supporting its claims from privacy, safety, and cybersecurity perspectives. Plaintiffs did not come forth with a declarant with personal or expert knowledge to discuss—let alone rebut—the grave privacy, personal safety, and cybersecurity concerns ICE raised. Instead, Plaintiffs simply argued in an unsworn Memorandum of Law that ICE's concerns

were not valid. Plaintiffs also repeatedly collapse the question of whether exemptions apply to certain records with whether the records they seek could be reasonably segregated from non-exempt records. To that end, Plaintiffs frequently argue ICE cannot claim an exemption *if* exempt data is reasonably segregable from non-exempt data. But whether data is reasonably segregable does not affect whether the exemption applies in the first instance. And, tellingly, Plaintiffs offer little by way of argument in opposition to applying the FOIA exemptions in the first instance.

For these reasons, this Court should grant ICE's motion for summary judgment and deny Plaintiffs' various forms of requested relief.

## FACTUAL BACKGROUND

### I.     The EID Contains Thousands of Potential Fields Of Data For Any Given Record And Data Pertaining To 20,000,000 Migrants.

Plaintiffs concede the EID's "records document nearly 20 million migrants' cases," approximately 1.2 million of whom are minors. Dkt. # 40-8 ¶ 15. Plaintiffs purportedly dispute ICE's calculation that the EID contains approximately 12,000 fields of data across roughly 1,000 tables.[1] But Plaintiffs do not dispute the broader point: EID data includes "detailed pictures of migrants' lives." *Id.* ¶ 16.

### II.     Disclosure Of EID Data Would Increase The Risk Of Cyberattacks On The EID.

ICE established the cybersecurity risks associated with disclosing a broad swath of the EID: "an increased likelihood of targeted cyberattacks, increased potential for successful data breaches, and unauthorized access to sensitive information." Dkt. # 40-2 ¶ 32; *see also id.* ¶¶ 33–39. ICE further explained, "[d]isclosing this information could reasonably result in increased opportunities for bad actors to attack the EID and associated systems." *Id.* ¶¶ 11, 20, 21. Plaintiffs

---

[1] Plaintiff Long's claim is demonstrably wrong. Gibney Reply. Decl. at ¶ 14.

failed to provide any evidence to undermine ICE's assessment.

### III.    Individuals Can Be Re-Identified From EID Data.

ICE established how and why disclosing the broad swaths of EID data Plaintiffs seek here could lead to re-identification of an individual even if redactions are applied. Dkt. # 40-8 ¶¶ 30, 46. ICE also identified the various actors that would be interested in obtaining this information for unlawful purposes: "gangs, cartels, human smugglers, traffickers, other criminal entities, and even abusive spouses or family members." *Id.* ¶¶ 52, 53. ICE further established the results of an experiment confirmed its re-identification concerns "in just under an hour." *Id.* ¶ 44. ICE further explained why mitigating the risk of re-identification would not be as simple as redaction. *Id.* ¶¶ 4–13. Plaintiffs offered no technical discussion of the re-identification risks to this Court.

### ARGUMENT

Plaintiffs repeatedly express uncorroborated skepticism toward the factual assertions and conclusions contained in ICE's declarations. But Plaintiffs' skepticism does not overcome the "presumption of good faith" afforded to ICE's reasonably detailed declarations. *Carney v. D.O.J.*, 19 F.3d 807, 812 (2d Cir. 1994) (citation omitted). "[C]ourts must grant summary judgment for an agency if its affidavit: (1) describes the justifications for nondisclosure with reasonably specific detail; and (2) is not substantially called into question by contrary record evidence or evidence of agency bad faith." *Schaerr v. D.O.J.*, 69 F.4th 924, 929 (D.C. Cir. 2023) (citations omitted). "[B]oilerplate allegations of bad faith do not constitute the specific facts required to threaten the good faith presumption." *Span v. D.O.J.*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010). Likewise, "conclusory allegations . . . are insufficient to create a material question of fact precluding summary judgment." *CareToLive v. F.D.A.*, 631 F.3d 336, 341 (6th Cir. 2011). This principle holds true even if "these assertions may be true," where "there is no factual evidence in the record supporting them." *Id.* at 343.

I.     **ICE's Estimate that it would take 8,360 hours to Comply with Plaintiffs' Operative FOIA Request is Unrebutted and Constitutes an Undue Burden under the FOIA.**

This Court is "entitled to rely upon an agency affidavit for an explanation of why a further search would be unduly burdensome when the affidavit is relatively detailed, nonconclusory, and not impugned by evidence in the record of bad faith on the part of the agency." *Wolf v. C.I.A.*, 569 F. Supp. 2d 1, 9 (D.D.C. 2008) (citation omitted). Plaintiffs have not adequately disputed the following four facts. First, the EID is not structured to readily provide the data Plaintiffs seek. Second, the EID is not designed to produce the data in the way Plaintiffs seek it. Third, ICE does not currently have a query that would respond to either Part 1 or Part 2 of Plaintiffs' request. Therefore, ICE would need to construct these queries in computer code to comply with Plaintiffs' FOIA request. Fourth, ICE would need to run the query it constructs in the EID for longer than a week. Fifth, the process required would take approximately 8,360 hours of employee time (and another 40 hours to run the queries and validate the data). These facts establish the undue burden of complying with Plaintiffs' FOIA request. Indeed, in prior litigation among these parties, a Court held a similar request for a "snapshot" of the EID constituted an undue burden. *Long v. I.C.E.*, 149 F. Supp. 3d 39, 55–58 (D.D.C. 2015) ("*Long I*").

Plaintiffs now try to recast their operative FOIA request to make it sound less burdensome. To that end, Plaintiffs argue they would have accepted the EID data "without modification to its existing organizational structure," but that is not how their request sought the data. *See* Dkt. # 47-1 at 13. Plaintiffs specifically requested "all datapoints (from any time) that are directly or indirectly linked to a person" with relational information preserved, which is not how the data is stored without modification. Dkt. # 40-7 at 2. Plaintiffs also question whether ICE could "simply copy[] EID tables and transmit[] them a few at a time to a FOIA requester." *See* Dkt. # 47-1 at 14. But again, Plaintiffs did not request ICE "simply copy" tables. Plaintiffs specifically requested

"all datapoints (from any time) that are directly or indirectly linked to a person" with preserved relational information. Dkt. # 40-7 at 2. Plaintiffs do not explain how these newfound suggestions would comply with their FOIA request or reduce ICE's burden in production. As ICE explained, preserving "directly and indirectly linked" data would require extensive work. Dkt. # 40-3.

Plaintiffs offer nothing to support their claim that these production techniques would lessen the burden on ICE. Indeed, as ICE explained, producing data from the EID in this way would require a customized query. *Id.*[2] In a similar vein, and in response to ICE's suggestion that one way to accomplish production here would be to provide a single spreadsheet with one row per record (i.e. event or encounter), which is one way to preserve direct and indirect links to data by grouping the data into rows (Dkt. # 40-3 at ¶ 43), Plaintiffs now argue ICE should have considered copying individual tables "a few at a time." But Plaintiffs do not explain how this would reduce the burden on ICE.[3]

While admitting the request appears nowhere in the operative FOIA request, Plaintiffs now argue they requested "a phased rollout of individual EID tables." Dkt. # 47-1 at 7, 13, n. 2.[4] Moreover, Plaintiffs do not even attempt to explain how a "phased rollout" would change the undue burden analysis, because it has no effect on that analysis. The Gibney Reply Declaration

---

[2] ICE's ability to internally transfer data between two systems designed to accommodate the transfer has nothing to do with ICE's ability to provide Plaintiffs with a dataset directly from the EID that preserves all datapoints (from any time) that are directly or indirectly linked to a person.

[3] ICE notes that this process could be considered the creation of a record, reserves its right to claim so in response to future requests, and for any other purpose as well. *See ACLU Immigrants' Rts. Project v. I.C.E.*, 58 F.4th 643, 663 & 663 nn. 24 & 25 (2d Cir. 2023) (collecting cases).

[4] Plaintiffs argue their superseded and operative FOIA requests should be read together. But Plaintiffs stated their operative FOIA request was written "to notify the Agencies that, for the purposes of this lawsuit, they will limit the scope of their legal challenges . . . ." Dkt. # 40-7 at 1. The operative FOIA request neither explicitly nor implicitly suggested a "phased rollout."

explains a "phased rollout" does not lessen the burden associated with complying with Plaintiffs' FOIA request as a whole. Gibney Reply Decl. ¶ 9. Thus, Plaintiffs failed to raise a question of fact as to whether these methods of production would (1) comply with their request as written, or (2) lessen the undue burden of complying with their request.

Plaintiffs—serial FOIA requesters with self-proclaimed knowledge and sophistication—should not now be allowed to avoid the plain meaning of their broad FOIA request, especially given that Plaintiffs have already limited the scope of their request once. *Bloeser v. D.O.J.*, 811 F. Supp. 2d 316, 321 (D.D.C. 2011) ("Because FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters, . . . [t]o the extent that plaintiff can [limit his request] such . . . information should have been included as part of his original FOIA request."). Indeed, a FOIA requester cannot enter litigation on a broad request and then "rely on the argument that the [agency] should have known what information Plaintiffs were seeking" because the FOIA does not require "an agency receiving a FOIA request . . . to divine a requester's intent." *Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 499 (S.D.N.Y. 2010).

Plaintiffs also wrongly claim ICE has materially overestimated the number of tables in the EID based on other litigation between Plaintiffs and ICE. ICE "initially disclosed EID data dictionary included details of 849 tables and 9,279 data fields," but then "[a] supplemental production in September 2024 contained details of the remaining 230 tables and 2,206 data fields." Gibney Reply Decl. ¶ 14. As the Gibney Reply Declaration explains, "there are 1,079 tables and 11,485 data fields" in the EID, which is reasonably consistent with his initial declaration and which does not affect the ultimate conclusion he draws: it would be laborious to handle *thousands of data fields pertaining to millions of individuals*. *Id.* Plaintiffs' claims are inaccurate and should be

disregarded.[5] And, even if there was a material inconsistency, Plaintiffs cannot meet their burden in opposition by claiming "inconsistencies" that amount to nothing more than "trivial matters," including "minor ambiguities." *SafeCard Servs. v. S.E.C.*, 926 F.2d 1197, 1202 (D.C. Cir. 1991).

Plaintiffs also invent a supposed conflict between ICE's Gibney Declaration and the EID Privacy Impact Assessment (PIA). The Declaration explained the EID data is "not kept or maintained in a way that would allow ICE to simply search for" all data related directly or indirectly to a single person. Dkt. # 40-3 ¶ 11. The EID PIA explains the "EID is the repository for all records created, updated, and accessed by a number of software applications collectively referred to as the ENFORCE applications." Katz Reply Decl. Exh. **"A"** at 2. The "ENFORCE applications . . . use the EID as a data-store." *Id.* As the PIA states, and as Gibney explained, "[a]n event-based record for each encounter is created in EID." *Id.* Plaintiffs then provided only one part of the remainder of the sentence: "the system provides users the capability to access a person-centric view of the data as well." But, in doing so, Plaintiffs changed the meaning of the sentence, which read "***through accessing data within the ENFORCE applications***" as opposed to directly through the EID. *Id.* at 2. Plaintiffs did not request information from applications. Plaintiffs requested data directly from the EID. Thus, what might be done through other applications does not bear on the issues presented here.

Likewise, Plaintiffs' arguments regarding Part 1 and Part 2 of the operative FOIA request conflate the EID and the applications that access the EID data. Discussing Part 1 of the operative FOIA request, Plaintiffs cite prior ICE testimony to argue ICE previously stated a user can search

---

[5] Moreover, Plaintiffs argue producing code translations would not require work. But, as ICE explains, the code tables bear on Plaintiffs' request for data directly or indirectly linked to an individual and therefore is relevant to the inquiry here. Gibney Reply Decl. ¶ 15.

the EID for all events connected to a specific person. But that testimony was related to an EARM application, not the EID itself. Dkt. # 47-5 at 6. Discussing Part 2 of the operative FOIA request, Plaintiffs claim CBP "retains the ability to pull encounter-by-encounter data back out of the EID." Dkt. # 47-1 at 17. But CBP has access to that EID data indirectly through applications that access data repositories. While these repositories provide "snapshots" of the EID data, the snapshots available to CBP "are subsets of the EID database repository that provide a continuously updated snapshot of selected EID data." Katz Reply Decl. Exh. **"A"** at 6. Indeed, the EID PIA explicitly states the data repositories "are queried instead of EID to protect the integrity of the live data held in the EID operational environment and to prevent the performance of EID and the ENFORCE applications from being diminished." *Id.* CBP's access to the EID data through data repositories "is read-only, so no data values are changed by users that query them." *Id.*

Finally, Plaintiffs trivialize the amount of data they seek—3.75 Terabytes—by arguing it can be stored "on a portable hard drive that is available online for $100 or less." Dkt. # 47-1 at 19. Even assuming ICE would provide the information on a physical drive, which Plaintiffs did not request in their operative FOIA request, Plaintiffs nevertheless do not explain how this change in media would result in a quicker file transfer.

Contrary to Plaintiffs' arguments, the Department of Homeland Security's FOIA regulations do not change the analysis. 6 C.F.R. § 5.4(i) begins by explaining, "[t]he FOIA allows components to not conduct a search for responsive documents if the search would cause significant interference with the operation of the component's automated information system."[6] ICE

_____

[6] "Creating a computer program that produces specific requested fields or records contained within a well-defined database structure ***usually*** is considered business as usual." *Id.* "A 'business as usual' approach exists when the component has the capability to process a FOIA request for

explained, in detail, why complying with Plaintiffs' FOIA request "would cause significant interference with the operation of [ICE's] automated information system." Dkt. # 40-3; Gibney Reply Decl. ¶ 9. Likewise, the FOIA does not obligate ICE to consider partial disclosure in response to an overbroad and unduly burdensome FOIA request. 5 USC § 552(a)(8) only applies where an agency invokes a FOIA exemption or disclosure is prohibited by law. The cases Plaintiffs cite reinforce this proposition. *ACLU Immigrants' Rights Project v. I.C.E.*, 58 F.4th 643 (2d Cir. 2023), analyzed this provision in the context of the FOIA exemptions and the reasonable segregation requirement. *New York Legal Assistance Group v. Bd. of Immigration Appeals*, 987 F.3d 207 (2d Cir. 2021), arose out of a separate FOIA provision, 5 U.S.C. § 552(a)(2), which requires proactive disclosure of "final opinions . . . made in the adjudications of cases," and other categories of records not at issue here.

## II.    FOIA Exemptions Bar Plaintiffs' Request.

Plaintiffs' FOIA request implicates exemptions 3, 6, and 7(A), (C), (E), and (F).[7] ICE provided detailed declarations explaining the risks presented to individuals and ICE if this Court orders ICE to comply with Plaintiffs' operative FOIA requests. Plaintiffs did not provide anything except skeptical speculation and conclusory cynicism in response. *E.g.*, *Allnet Comm'n v. F.C.C.*, 800 F. Supp. 984, 989 (D.D.C. 1992) ("[A] requester's opinion disputing the risk created by disclosure is not sufficient to preclude summary judgment for the agency, when the agency possessing the relevant expertise has provided sufficiently detailed affidavits." (citation omitted)).

---

electronic records without a significant expenditure of monetary or personnel resources." *Id.* ICE is "not required to conduct a search that does not meet this business as usual criterion." *Id.*

[7] Plaintiffs do not dispute the records Plaintiffs seek are "compiled for law enforcement purposes," as they previously conceded in another case. *Long v. I.C.E.*, 149 F. Supp. 3d 39, 49 (D.D.C. 2015).

A.    *Plaintiffs Failed to Rebut ICE's Privacy and Safety Assessment, Which Underlies Exemptions 7(C), 7(F), and 6.*

Without providing evidence to support their assertions, Plaintiffs disparage ICE's concern that a variety of vulnerable individuals could be reidentified as theoretical and hypothetical. ICE established a variety of groups whose identities could reasonably be revealed, including migrants, their family members, witnesses, DHS personnel, and other governmental officials. Dkt. # 40-8 ¶¶ 23–27. ICE also explained how revealing those individuals' identities could not only lead to an unwarranted invasion of privacy but also a threat to their physical safety and mental wellbeing, including "social exclusion and discrimination, psychological distress, political persecution, and assassination" as well as "retaliation, exploitation, and other abuses." *E.g.*, *id.*, ¶¶ 51–70; *see also id.* ¶ 7. Moreover, as to government officials, ICE explained the risk of "retribution against law enforcement agents who disrupted criminal enterprises" and that criminal enterprises may "conduct[] counter-surveillance against agents investigating criminal networks." Dkt. # 40-8 ¶ 65. Plaintiffs do not contest these types of risks flowing from identification are cognizable as invasions of privacy interests under Exemption 7(C).

Plaintiffs also do not deny that the risk of re-identification exists. Instead, Plaintiffs claim the risks are theoretical and hypothetical. See e.g., Dkt. # 47-1 at 22. But these harms do not need to materialize before information becomes exempt from the FOIA. In any event, Plaintiffs' criticism is belied by the experiment ICE conducted. ICE "provided" its cybersecurity personnel "with sample EID records." Dkt. # 40-8 ¶ 44. The cybersecurity personnel took "just under an hour" to reidentify individuals from EID data, even though the data did not include the names of the individuals or any other direct identifiers. *Id.* ICE also provided several examples of the vulnerabilities migrants face, including being targeted by fraudsters, violence from anti-immigrant

groups, and sexual exploitation, which would be exacerbated by re-identification. Dkt. # 40-8 ¶ 53(f), 61(a), 62(a). Moreover, as ICE explained, five years ago "researchers at the Imperial College of London produced algorithms that could correctly identify 99.98% of Americans from any data set using only 15 basic demographic indirect identifiers." *Id.* ¶ 11(a).

       i.      Exemption 7(C).

Plaintiffs do not contest the EID data they request pertains to migrants, their family members, witnesses, DHS personnel, and other governmental officials, or that those individuals have cognizable privacy interests under Exemption 7(C). The "government need not 'prov[e]' to a certainty that release will lead to an unwarranted invasion of personal privacy" to invoke this exemption. *Keys v. D.O.J.*, 830 F.2d 337, 346 (D.C. Cir. 1987) (citation omitted). "It need only demonstrate a 'reasonable' expectation of such an invasion." *Id.* Even if ICE only provided theoretical or hypothetical concerns, ICE would have carried its burden of establishing the data Plaintiffs seek "*could reasonably* be expected to constitute *an unwarranted* invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (emphasis added).

Contrary to Plaintiffs' arguments, ICE does not bear the burden of addressing in its moving papers the public interest in disclosure. *NARA v. Favish*, 541 U.S., 157 at 172; *Lewis v. D.O.J.*, 867 F. Supp. 2d 1, 19 (D.D.C. 2011). Plaintiffs do. *Id.* "Where the privacy concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the information to establish a sufficient reason for the disclosure," which includes "show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake" and that the "information is likely to advance that interest." *NARA*, 541 U.S. at 172. "Otherwise, the invasion of privacy is unwarranted." *Id.* Plaintiffs did not meet their burden. Plaintiff Long did not address the public interest in disclosure of this information in her declaration.

In their Memorandum of Law, Plaintiffs merely conclude, without explanation, let alone evidence, that "the bulk of the information in the EID appears to concern *ICE's* activities, and Plaintiffs' motivation for seeking the requested records is to expose those activities to public view." Dkt. # 47-1 at 28.

The gravamen of Plaintiffs' argument against the application of Exemption 7(C) is that ICE should be able to determine which data it needs to remove to avoid the risk of re-identification. But, as ICE explained, this process—known as anonymizing the data—is incredibly complex. Plaintiffs seek "all datapoints (from any time) directly or indirectly linked to a person," which for EID purposes means thousands of datapoints. Dkt. #40-8 ¶¶ 3-4. Because of the broad scope of Plaintiffs' request, "anonymizing the broad swath of data Plaintiffs seek is technically infeasible, if not practically impossible." *Id.* ¶ 13. Indeed, Plaintiffs' own request for relational information and/or substitute identifiers only exacerbates these risks. *Id.* Plaintiffs also complain that ICE should be able to redact certain fields to allay its concerns. But ICE went to great lengths to explain why mere redaction will not avoid these risks. Dkt. # 40-8 ¶¶ 11–13, 29–47.

Plaintiffs argue ICE has previously provided unredacted data, which Plaintiffs use to imply ICE should not be able to raise Exemption 7(C) here. But the examples Plaintiffs give distinguish themselves from this case by virtue of the vast difference in the data sought there versus the data sought here. *See. e.g.*, Gibney Reply Decl. at ¶ 13. This FOIA request, by contrast to previous requests, involves 12,000 fields of data for tens of millions of individuals—the entire contents of the EID. Gibney Reply Decl. at ¶¶ 8, 12, 14 and Dkt. # 40-3 ¶ 13. Likewise, Plaintiffs' argument that ICE sometimes identifies individuals by name vitiates ICE's ability to assert Exemption 7(C) to protect any individuals falls flat. Plaintiffs point to two press releases, one involving the removal of an individual and the other involving the apprehension of an individual. The fact that ICE

releases some limited information does not mean that it cannot protect millions of individuals from the public disclosure of thousands of EID datapoints.

ii.    Exemption 7(F).

Exemption 7(F) protects law enforcement data where disclosure "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(C). This exemption protects "any individual whose life or physical safety" may be at risk, *Amuso v. D.O.J.*, 600 F. Supp. 2d 78, 101 (D.D.C. 2009), including where disclosure could "likely result in harassment and/or retaliation." *Anderson v. Bureau of Prisons*, 806 F. Supp. 2d 121, 128 (D.D.C. 2011). An agency prevails on Exemption 7(F) where it establishes the risks involved in disclosure because exemption 7(F) is an "absolute ban" on disclosure. *Raulerson v. Ashcroft*, 271 F. Supp. 2d 17, 29 (D.D.C. 2002). Courts defer to agency declarations as to the risks posed by disclosure. *Gonzalez v. U.S.C.I.S.*, 475 F. Supp. 3d 334, 353 (S.D.N.Y. 2020).

In its moving papers, ICE identified a series of specific risks as exemplars of the dangers to the physical safety of those whose data is contained in the EID. Plaintiffs provide nothing more than conclusory and dismissive skepticism as to the risks presented. Instead, Plaintiffs argue "targeted redaction" can "avert the risk of harm." Dkt. # 47-1 at 30. But ICE already explained why targeted redaction will *not* protect vulnerable individuals from re-identification. *See* Dkt. # 40-8 ¶¶ 11–13, ¶¶ 29–47. Plaintiffs also question ICE's cybersecurity concerns pertaining to releasing all directly and indirectly linked data from the EID. Plaintiffs have provided nothing except Plaintiffs' counsel's own conclusion that ICE has overestimated this risk in their papers.

iii.    Exemption 6

Plaintiffs relied on their arguments in opposition to ICE's invocation of Exemption 7(C). Likewise, ICE adopts its reply arguments pertaining to Exemption 7(C) as if fully set forth here.

B.    *Plaintiffs Failed to Rebut ICE's Cybersecurity Assessment*

ICE's Chief Information Security Officer explained the cybersecurity risks associated with complying with Plaintiffs' request, which includes "an increased likelihood of targeted cyberattacks, increased potential for successful data breaches, and unauthorized access to sensitive information." Dkt. # 40-2 ¶ 32; *see also id.* ¶¶ 33–39. He further explained, "[d]isclosing this information could reasonably result in increased opportunities for bad actors to attack the EID and associated systems." *Id.* ¶¶ 11, 20, 21. Plaintiffs failed to provide any evidence to undermine ICE's assessment or establish its bad faith.

    i.    Exemption 7(A).

Plaintiffs incorrectly argue ICE bore the burden of establishing a specific proceeding that would be affected to invoke Exemption 7(A). The agency "is not required to make a specific factual showing with respect to each withheld document that disclosure would actually interfere with a particular enforcement proceeding." *Lazardis v. Dep't of State*, 934 F. Supp. 2d 21, 37 (D.D.C. 2013) (citations omitted). It is well established that "federal courts may make generic determinations that . . . disclosure of particular kinds of investigatory records while a case is pending would generally interfere with enforcement proceedings." *Id.* (citations omitted). ICE met this burden by showing at least three ways that such interference could occur. First, a cyberattack could hamper ICE's ability to present evidence in enforcement proceedings. Dkt. # 40-2 ¶ 21. Second, ICE could have trouble securing witnesses' testimony if those witnesses are re-identified. Dkt. # 40-8 ¶¶ 23, 55. Third, prosecutors could be identified by bad actors. *Id.* ¶ 69.

    ii.    Exemption 7(E).

Plaintiffs and ICE have previously addressed this issue in the context of metadata within ICE databases. *Long v. I.C.E.*, 464 F. Supp. 3d 409, 422–23 (D.D.C. 2020) ("*Long II*"). In that case, the Court found it persuasive that disclosure would "incentivize future attacks and make

those attacks more harmful" if disclosure was ordered. *Id.* Notably, the Court found for ICE on this issue and explained, "the potential for a cyber-attack or data breach is the kind of risk of circumvention of the law that justifies withholding under Exemption 7." *Long I*, 149 F. Supp. 3d at 51. Here, Plaintiffs do not dispute the EID constitutes a High Value Asset and a Mission Critical System. Therefore, Plaintiffs do not—and cannot—dispute that "unauthorized access, use, disclosure, disruption, modification, or disruption could cause a significant impact to the United States' national security interests, . . . or public health and safety of the American people" or that "[c]atastrophic failure of the system, or unauthorized disclosure of law enforcement data in the system, could significantly disrupt ICE's law enforcement mission." Dkt. # 40-2 ¶¶ 4, 5.

Plaintiffs' opposition does not include any evidence from the cybersecurity field, by declaration or otherwise. *Cf. Long I*, 149 F. Supp. 3d at 52 (noting Plaintiffs provided evidence from a cybersecurity professional in opposing this motion for summary judgment). In their Memorandum of Law, Plaintiffs argue ICE has not established the risk of a cybersecurity attack on the EID. But ICE provided half a dozen types of cybersecurity attacks that have *actually* occurred. Dkt. # 40-2 ¶¶ 35–39, nn. 12–17. ICE then concluded, "Plaintiffs' FOIA Request, if complied with, would expose ICE and the EID to increased cybersecurity risks." *Id.* ¶ 40. As ICE further explained, providing the information requested "could provide attackers with a roadmap to exploit vulnerabilities, launch targeted attacks, and compromise sensitive systems availability and integrity." *Id.* ¶ 41.

Plaintiffs also complain that ICE has not explained which law enforcement techniques would be revealed in a cyberattack. The method of storage of information about subjects is itself a law enforcement technique. *Long I*, 149 F. Supp. 3d at 49–50. Exemption 7(E) imposes a low bar on the agency and "[c]ourts must heed that low bar, especially in cases where an agency has

warned that disclosure could lead to a cyber-attack on, or security breach of, an agency data system containing sensitive law enforcement and personal information" because "[j]udges are not cyber specialists, and it would be the height of judicial irresponsibility for a court to blithely disregard such a claimed risk." *Id.* at 53.

Moreover, revealing "all datapoints (from any time) that are directly or indirectly linked to a person" would reveal information gleaned through law enforcement techniques and methods over time and across subjects, which in turn allows for someone analyzing the data to uncover law enforcement techniques used to gather the information. Dkt. # 40-2 ¶ 11. Plaintiffs argue against this position, but do not provide any *authority* for their argument. Exemption 7(E) sets the bar "relatively low." *Skinner v. D.O.J.*, 893 F. Supp. 2d 109, 114 (D.D.C. 2012), *aff'd*, No. 12-5319, 2013 WL 3367431 (D.C. Cir. May 31, 2013). Moreover, "it is not unreasonable for ICE to expect that greater harm might result from a cyberattack where the attacker has detailed advance knowledge of the structure and organization of the databases." *Long II*, 464 F. Supp. 3d at 421.[8]

    C.    *Exemption 3.*

Plaintiffs do not dispute that FOIA does not require an agency to comply with FOIA's disclosure obligations at the expense of violating another statute. Of particular note, Plaintiffs do not offer any analysis of any of the statutes cited by ICE in its moving papers to show those statutes would not apply to certain data in the EID, or that those statutes qualify under Exemption 3. Plaintiffs have requested a broad swath of data, and ICE provided an appropriate survey of the statutes implicated by Plaintiffs' request, especially in light of its contention that the search itself

---

[8] The discussion there pertained to metadata that revealed the organization and structure of the EID, but the same principles apply to this FOIA request, which seeks similar "relational information" and "all datapoints (from any time) that are directly or indirectly linked to a person."

constitutes an undue burden and therefore has not yet been performed.

     D.     *Plaintiffs Failed to Rebut ICE's Reasonable Segregation Analysis*

Where, as here, a response would contain exempt and non-exempt information, courts next ask whether the information can be reasonably segregated. *Sorin v. Dep't of Just.*, 758 F. App'x 28, 33 (2d Cir. 2018). Courts consider the burden imposed to segregate records in this analysis. *E.g.*, *Durrani v. D.O.J.*, 607 F. Supp. 2d 77, 88 (D.D.C. 2009). Courts have also required Plaintiffs to rebut the good-faith presumption for agency declarations in the reasonable segregation context. *Reporters' Comm. v. C.B.P.*, 567 F. Supp. 3d 97, 131 (D.D.C. 2021).

     i.     Exemption 3.

As ICE explained in its moving papers, "the production of EID data—which contains thousands of datapoints—will involve analyzing each datapoint at the outset to determine whether it would categorically include information prohibited from disclosure by more than a dozen different statutes with different scopes." Dkt. # 40-1 at 41. Given the laborious nature of that search—and the diverse information within the EID—the EID data that triggers Exemption 3 (and other exemptions) is not reasonably segregable from the non-exempt data.

     ii.     Exemption 6.

Plaintiffs relied on their arguments in opposition to ICE's invocation of Exemption 7(C). Likewise, ICE adopts its reply arguments pertaining to Exemption 7(C) as if fully set forth here.

     iii.     Exemption 7(A).

Plaintiffs also argue ICE failed to consider whether it could release records related to closed cases. But Plaintiffs' operative FOIA request does not make that inquiry so simple. By requesting "all datapoints (from any time) directly or directly linked" to an individual, Plaintiffs have sought information that cannot be so easily segregated.

iv.      Exemption 7(C).

The gravamen of Plaintiffs' argument against the application of Exemption 7(C) is that ICE should be able to determine which data it needs to remove to avoid the risk of re-identification. But, as ICE explained, this process—known as anonymizing the data—is incredibly complex. Plaintiffs seek "all datapoints (from any time) directly or indirectly linked to a person," which means thousands of datapoints. Dkt. # 40-8 ¶ 15. Because of Plaintiffs' broad request, "anonymizing the broad swath of data Plaintiffs seek is technically infeasible, if not practically impossible." *Id.* ¶ 13. Indeed, Plaintiffs' own request for relational information and/or substitute identifiers only exacerbates these risks. *Id.* Plaintiffs also complain that ICE should be able to redact certain fields to allay its concerns. But ICE went to great lengths to explain why mere redaction will not avoid these risks. *Id.* ¶¶ 11–13 (describing risks generally), ¶¶ 29–47 (describing techniques used for re-identification and how the techniques could be applied to the EID).

v.      Exemption 7(F).

Plaintiffs argue "targeted redaction" can "avert the risk of harm." Dkt. # 47-1 at 30. But ICE explained why targeted redaction will *not* protect vulnerable individuals from re-identification. *See* Dkt. # 40-8 ¶¶ 11–13, ¶¶ 29–47.

vi.      Exemption 7(E).

Plaintiffs claim ICE, through its cybersecurity declarant, conceded redaction would be possible. Not so. Even with redaction, ICE explained, "producing a large quantity of data—with interconnections between the data preserved—would provide a consolidated, macro-level view of . . . potential weaknesses in one source," which "makes a cyber attacker's job easier and would present unique and severe cybersecurity threats." Dkt. # 40-2 ¶ 32.

**III.    Plaintiffs are Not Entitled to Summary Judgment.**

Even if this Court denies ICE's motion for summary judgment, it does not follow that Plaintiffs have established their right to summary judgment. *Shays v. F.E.C.*, 424 F. Supp. 2d 100, 109 (D.D.C. 2006). Plaintiffs have not rebutted ICE's factual statements or prevailed on their legal arguments. And, for the same reasons, ICE has established Plaintiffs' FOIA request does not trigger ICE's FOIA obligations. Even if this Court does not grant ICE's motion for summary judgment, this Court has a variety of procedural options available to it that should be utilized prior to granting summary judgment to Plaintiffs, including ordering supplemental briefing and/or an evidentiary hearing. *Long II*, 464 F. Supp. 3d at 424, 427.

**IV.    Plaintiffs Did Not Establish a Reason to Order Discovery Here.**

Plaintiffs state Magistrate Judge Dancks authorized service of discovery demands, which Defendants have responded to as of today, but crucially Judge Dancks also noted at the same conference that Plaintiffs had not established a right to discovery.  Plaintiffs failed to establish a reason to conduct discovery pursuant to Rule 56(d). While Rule 56 gives the Court discretion to order discovery, "entitlement to relief . . . depends upon the non-movant explaining: (1) the facts which are sought in further discovery; (2) how those facts are expected to create a genuine issue of material fact; (3) what efforts the non-movant has made to obtain these facts; and (4) why these efforts were unsuccessful." *Ajluni v. F.B.I.*, 947 F. Supp. 599, 607 (N.D.N.Y. 1996) (citation omitted). In FOIA cases, "if the court finds that an agency's declarations are reasonably detailed, submitted in good faith and the court is satisfied that no factual dispute remains, then discovery should be denied." *Jarvik v. C.I.A.*, 741 F. Supp. 2d 106, 123 (D.D.C. 2010) (citations omitted). "A requestor is not entitled to discovery based on . . . its belief that the agency is withholding information" or where it "would only . . . afford the plaintiff an opportunity to pursue a bare hope of falling upon something that might impugn the affidavits." *Jarvik*, 741 F. Supp. 2d at 122.

Plaintiffs had an obligation "to file a proper affidavit [or declaration] in support of its motion for discovery." *CareToLive*, 631 F.3d at 344. Indeed, Plaintiffs bore a heavy burden in seeking discovery: "the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations . . . or summary judgment is otherwise inappropriate." *Carney*, 19 F.3d at 812. Plaintiffs had to provide a "factual basis for the relief" sought. *Id.* "Conclusory allegations that other undisclosed records must exist somewhere and that the agency is deliberately concealing records do not rise to the level of bad faith." *CareToLive*, 631 F.3d at 346. Instead, the case law required Plaintiffs to establish their claims by "tangible proof." *Carney*, 19 F.3d at 813. "[S]omething more than his bare allegations is needed." *Id.* Plaintiffs must "instill[] confidence in" the Court that they can "make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some other evidence why summary judgment is inappropriate." *CareToLive*, 631 F.3d at 345 (citations omitted). Plaintiffs failed to meet this heavy burden. The Long Declaration did not raise a genuine issue of material fact, and Plaintiff Long certainly did not provide "tangible proof" for her assertions, let alone establish bad faith. *Carney*, 19 F.3d at 813.

Courts generally order supplemental submissions to address specific issues before ordering discovery. *Beltranena v. Clinton*, 770 F. Supp. 2d 175, 187 (D.D.C. 2011). Moreover, despite the "well-established" rule that "discovery may be greatly restricted in FOIA cases," Plaintiffs have not proposed a limited scope of discovery here. *Heily v. Dep't of Comm.*, 69 F. App'x 171, 174 (4th Cir. 2003). Limiting discovery in FOIA cases serves an important goal: ensuring Plaintiffs cannot use discovery to short circuit the FOIA process. *Lane v. Dep't of Interior*, 523 F.3d 1128, 1134 (9th Cir. 2008). Courts also guard agencies against attempts to obtain an agency's thought processes

regarding exemptions. *Ajluni*, 947 F. Supp. at 608. For these reasons, this Court should deny Plaintiffs' request for discovery.

## CONCLUSION

For all the reasons discussed above, U.S. Immigration and Customs Enforcement respectfully requests that this Court enter an Order granting summary judgment and denying Plaintiffs' cross-motion, accordingly, dismissing this action as against U.S. Immigration and Customs Enforcement along with such further relief as this Court deems fair, just, and equitable.

Dated: December 13, 2024              CARLA B. FREEDMAN
                                      United States Attorney


                               By:    _____/s/_____
                                      David M. Katz
                                      Assistant United States Attorney
                                      Bar Roll No. 700065