UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SUSAN B. LONG and )
TRAC REPORTS, INC., )
 )
Plaintiffs, )
 )
v. )
 )    No. 5:23-cv-1564 (DNH/TWD)
U.S. IMMIGRATION AND CUSTOMS )
ENFORCEMENT and )
U.S. CUSTOMS AND BORDER )
PROTECTION, )
 )
Defendants. )
_____ )

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**

Nicolas A. Sansone
(admitted pro hac vice)
Michael T. Kirkpatrick
(admitted pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ....................................................................................................................... 3

I.     Plaintiffs are entitled to partial summary judgment against ICE. ..................................... 3

    A.  There is no dispute that ICE can feasibly copy and produce individual EID tables, including the "CSE" table. ............................................................................ 3

    B.  There is no dispute that segregable portions of the requested records, including the "CSE" table, can be produced without harming an interest protected by FOIA's exemptions. ........................................................................................... 10

        1.  ICE can undisputedly produce records that do not contain sensitive personal information without harming the privacy or safety interests of Exemptions 6, 7(C), and 7(F). ................................................................................. 10

        2.  ICE can undisputedly produce EID data and certain metadata without harming the law-enforcement interests of Exemptions 7(A) and 7(E). ............................. 14

        3.  ICE has not identified any EID records that are specifically exempted from disclosure by an Exemption 3 statute. .................................................. 16

II.    In the alternative, this Court should order ICE to respond to Plaintiffs' discovery demands. .................................................................................................. 17

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Akel v. U.S. Department of Justice,*
No. 20-cv-03240, 2024 WL 939974 (D.D.C. Mar. 4, 2024) .................................................. 20

*American Civil Liberties Union Immigrants' Rights Project v. U.S. Immigration & Customs
Enforcement,*
58 F.4th 643 (2d Cir. 2023) ................................................................................ 7, 10

*Bloomberg L.P. v. U.S. Postal Service,*
118 F.4th 307 (2d Cir. 2024) ............................................................................... 16

*Carney v. U.S. Department of Justice,*
19 F.3d 807 (2d Cir. 1994)................................................................................. 17

*Center for Investigative Reporting v. U.S. Department of Justice,*
14 F.4th 916 (9th Cir. 2021) ................................................................................ 5

*Cox v. U.S. Department of Justice,*
111 F.4th 198 (2d Cir. 2024) ............................................................................... 17

*Families for Freedom v. U.S. Customs & Border Protection,*
837 F. Supp. 2d 331 (S.D.N.Y. 2011)...................................................................... 20

*Mead Data Central, Inc. v. U.S. Department of the Air Force,*
566 F.2d 242 (D.C. Cir. 1977) ............................................................................. 13

*New York Legal Assistance Group v. Board of Immigration Appeals,*
987 F.3d 207 (2d Cir. 2021)............................................................................. 9, 10

*Seife v. U.S. Food & Drug Administration,*
43 F.4th 231 (2d Cir. 2022) ......................................................................... 3, 4, 12

**Statutes**

5 U.S.C. § 552(a)(3)(B) ...................................................................................... 5

5 U.S.C. § 552(a)(8)(A)(i) ................................................................................... 9

5 U.S.C. § 552(a)(8)(A)(i)(I) ......................................................................... 10, 11, 14

5 U.S.C. § 552(a)(8)(A)(ii)(I) ............................................................................... 9

5 U.S.C. § 552(b)(3) ........................................................................................ 16

5 U.S.C. § 552(b)(6) ........................................................................................ 11

5 U.S.C. § 552(b)(7)(A) ................................................................................... 14

5 U.S.C. § 552(b)(7)(C) ................................................................................... 11

5 U.S.C. § 552(b)(7)(E) ................................................................................... 14

5 U.S.C. § 552(b)(7)(F) ................................................................................... 11

## PRELIMINARY STATEMENT

Defendant U.S. Immigration and Customs Enforcement (ICE) claims that it need not produce any records in response to a Freedom of Information Act (FOIA) request by Plaintiffs Susan B. Long and TRAC Reports, Inc., for data from the Enforcement Integrated Database (EID) because disclosing all responsive records would supposedly be burdensome and because some of the records contain information that FOIA exempts from disclosure. Plaintiffs have explained that they are entitled to partial summary judgment on their FOIA claim because ICE's arguments create no genuine dispute as to whether ICE can feasibly start producing individual EID tables a few at a time, while redacting any material that ICE claims is exempt. Dkt. 47-1 at 35–36. ICE's response offers no persuasive rejoinder.

On burdensomeness, ICE cannot point to any record evidence that Plaintiffs' proposal of a phased rollout of individual EID tables would be infeasible. Instead, it argues that Plaintiffs' FOIA request did not explicitly ask for the records to be produced in this way and that this manner of production would not be responsive to Plaintiffs' request. But Plaintiffs' request did not limit the manner of production to any particular format, and ICE bears the burden of establishing that the records cannot feasibly be produced. Meanwhile, ICE is simply incorrect that copies of individual EID tables would be unresponsive to the request. Plaintiffs requested certain data from within the EID, and copying and transmitting that data would fulfill the request. At a minimum, ICE's claim that full production would be burdensome cannot excuse ICE from making at least a partial production of responsive EID tables. Rather than answering this point, ICE dismisses FOIA's partial-production requirement as inapplicable without any explanation.

Meanwhile, ICE does not dispute that at least some of the records that Plaintiffs seek are nonexempt. ICE first invokes a set of exemptions that protect personal privacy and safety, alluding

to the risk that a bad actor could reidentify the people to whom the requested records relate. ICE, however, has not come forward with any evidence that this theoretical risk is reasonably likely to materialize or that any potential harms associated with reidentification could not be mitigated by redacting any particularly sensitive data. Indeed, ICE's routine practice of releasing large volumes of person-by-person EID records belie its claimed reidentification concerns. ICE next voices concern about cybersecurity to justify its claim that certain exemptions that protect specified law-enforcement records relieve it of the duty to produce any records. ICE's claimed concerns, though, relate to the release of metadata and not the underlying substantive data that Plaintiffs principally seek. Here too, moreover, ICE's past releases undermine its claim that no level of redaction can alleviate its concerns, and ICE's own evidence suggests redaction as a possibility. Finally, ICE briefly claims that a smattering of statutory provisions exempt certain EID records from disclosure, but ICE fails to carry its burden of specifying *which* records or explaining how the statutory provisions that it invokes would apply to them.

In the alternative, this Court should defer ruling on summary judgment until Plaintiffs have had the opportunity to conduct discovery into ICE's claimed defenses. The present record, at a minimum, casts serious doubt on ICE's claims that honoring Plaintiffs' request would necessarily be burdensome and that exempt material cannot be segregated and redacted from any released records. Plaintiffs have served targeted discovery demands on ICE to explore the factual basis for these claimed defenses, and ICE has refused to provide any responses. ICE offers no sound reason why this Court should decline to order it to engage in the discovery process that is ordinarily required of civil litigants. To the extent that a more developed evidentiary record is needed to assure the Court that ICE's claimed defenses are insufficient to preclude a grant of partial summary judgment for Plaintiffs, the Court should order ICE to respond to Plaintiffs' discovery demands.

## ARGUMENT

I. **Plaintiffs are entitled to partial summary judgment against ICE.**

Plaintiffs submitted a FOIA request to ICE well over a year ago, and ICE has not yet produced any responsive records. Accordingly, Plaintiffs are entitled to summary judgment on their FOIA claim unless ICE can carry its "burden of 'justify[ing] the withholding'" of the records that Plaintiffs seek. *Seife v. FDA*, 43 F.4th 231, 235 (2d Cir. 2022) (alteration in original; quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). ICE maintains that full production would be infeasible and that some of the requested records contain material that FOIA exempts from disclosure, but it has not established a genuine dispute over whether it can feasibly begin copying and producing undisputedly *non*exempt data from individual EID tables without further delay. Plaintiffs are accordingly entitled to summary judgment with respect to these records.[1]

### A. There is no dispute that ICE can feasibly copy and produce individual EID tables, including the "CSE" table.

ICE incorrectly states that there is no genuine dispute over ICE's claim that it "would take approximately 8,360 hours of employee time (and another 40 hours to run the queries and validate the data)" to comply with Plaintiffs' operative FOIA request. Dkt. 51 at 4. As Plaintiffs have explained, ICE's estimate addresses the length of time that it would supposedly take to produce the requested records *in a particular form*—namely, in a single, massive spreadsheet that lumps together all of the records that Plaintiffs seek in one aggregated file. *See* Dkt. 47-1 at 7. ICE has

---

[1] ICE maintains that even if Plaintiffs are entitled to partial summary judgment on the existing record, this Court should "order[] supplemental briefing and/or an evidentiary hearing" instead of granting relief. Dkt. 51 at 19. Yet ICE holds all of the relevant evidence, and it has not explained why it should be permitted a second bite at the apple when it had every incentive to adequately establish its claimed defenses the first time around. *See infra* pp. 19–20 (citing cases that express impatience with substantial delays that result from repeated cycles of summary judgment motions in FOIA cases).

not produced an estimate of how long it would take to copy and transmit the requested records in some other form, such as in the manner specified in Plaintiffs' initial FOIA request: "table by table," in a format that "retains the structure of the underlying data." Dkt. 40-5 at 2.

Faced with an obvious alternative to the format that ICE claims would be overly burdensome, ICE claims that Plaintiffs have "recast their operative FOIA request" because the request did not ask ICE to "'simply copy' tables." Dkt. 51 at 4. Critically, though, the request *also* did not ask ICE to create "a single spreadsheet with one row per record," which ICE and its declarant, Timothy Gibney, describe as "one way" to produce the requested records. *Id.* at 5; *see also* Dkt. 51-1 ¶ 10 (Mr. Gibney's statement that "a single table" would be "one plausible … way to structure a production of the data Plaintiffs seek"). Rather, the FOIA request asked ICE to produce specified records, and it is ICE's burden to establish that it would be infeasible to do so, *see Seife*, 43 F.4th at 235—not just that "one way" of doing so would be difficult.[2]

ICE also misunderstands its burden when it complains that Plaintiffs "do not explain" how simply copying and transmitting individual EID tables, a few at a time, would "reduce the burden on ICE." Dkt. 51 at 5. ICE bears the burden of establishing that such a procedure would *not* be feasible; Plaintiffs do not bear the burden of establishing that it would be. And neither of the two declarations from Mr. Gibney that constitute the entirety of ICE's evidence on burdensomeness speaks *at all* to the feasibility of this mode of production, *see* Dkt. 40-3; Dkt. 51-1, even though Plaintiffs squarely proposed it, Dkt. 47-1 at 7–8. The closest that Mr. Gibney comes to opining on Plaintiffs' proposal of a phased rollout of individual EID tables is a statement in his supplemental declaration that "break[ing]" the process described in his initial declaration "into several phases"

---

[2] Despite ICE's suggestion, the fact that a different court examining a different evidentiary record held that ICE had shown that complying with a different FOIA request would be infeasible has no bearing here. *See* Dkt. 51 at 4 (citing *Long v. ICE*, 149 F. Supp. 3d 39, 55–58 (D.D.C. 2015)).

would not "lessen the overall burden" of *that* process. Dkt. 51-1 ¶ 9 (italics omitted); *see* Dkt. 51 at 5–6. Again, though, Mr. Gibney's initial declaration addresses the supposed burden of drawing all of the requested data into a single spreadsheet and not the amount of work that it would take to simply copy and transmit individual EID tables.[3]

What is more, Plaintiffs *have* produced evidence that ICE's own witness in a prior case stated that copying data from "a transactional system such as EID" and loading it into a different system is a "standard process" that ICE routinely undertakes. Dkt. 47-1 at 8 (quoting Dkt. 47-4 at 32–33). In a footnote that does not cite to any evidence, ICE claims that its "ability to internally transfer data" has "nothing to do" with Plaintiffs' request that ICE copy data and transfer it externally to them. Dkt. 51 at 5 n.2. But ICE, which bears the burden of justifying its failure to produce any responsive records, identifies nothing in the record to suggest that the steps involved in copying data from the EID and transmitting it to an internal system differ meaningfully from the steps involved in copying data from the EID and transmitting it to, for example, an external hard drive or a cloud-based folder that can be shared with an outside user.

Unable to point to any record evidence suggesting that copying and transmitting a series of individual EID tables would be infeasible, ICE instead suggests that this method of producing the requested records would not "comply with [Plaintiffs'] request as written." *Id.* at 6. To the extent that ICE implies that this method would be unavailing because Plaintiffs have voluntarily

---

[3] In a footnote, ICE suggests (without arguing) that making copies of EID tables "could be considered the creation of a record" and so might fall outside the scope of what FOIA requires. Dkt. 51 at 5 n.3. The suggestion is absurd. If the need to copy a requested record could relieve an agency of its duties under FOIA, then the statute's requirements would *never* apply, except in the unlikely scenario where an agency is able and willing to give away its original files. Congress did not write such an ineffectual statute. *Cf. Ctr. for Investigative Reporting v. DOJ*, 14 F.4th 916, 938 (9th Cir. 2021) (citing cases that "have held that sorting, extracting, and compiling pre-existing information from a database does not amount to the creation of a new record"); 5 U.S.C. § 552(a)(3)(B) (requiring an agency to attempt to maintain its records in "reproducible" formats).

narrowed their request to seek datapoints associated with two specific groups of people, not entire tables, *id.* at 4–5, ICE is wrong. For one thing, ICE's own declarant purports to read Plaintiffs' operative request as seeking "the entire contents of the EID." Dkt. 51-1 ¶ 8. If this is how ICE understands the request, then the production of entire tables would clearly be responsive. But even setting this point aside, Plaintiffs have explained without rebuttal that one set of datapoints that they seek—datapoints that are "directly or indirectly linked to a person for whom [ICE] ha[s] established an official case seeking that person's removal from the country," Dkt. 40-7 at 2—can be produced by providing copies of a specific EID table called the "CSE" table, as well as those tables that are directly or indirectly linked to it. *See* Dkt. 47-1 at 7–8.

ICE does not respond to this point. Indeed, ICE's brief does not mention the "CSE" table at all. The brief vaguely suggests that "preserving 'directly and indirectly linked' data would require extensive work," Dkt. 51 at 5, but its only citation for this claim is Mr. Gibney's initial declaration, which, again, discusses the efforts that would be required to build a query capable of pulling all responsive records together into a single spreadsheet. Were ICE to copy individual tables, as Plaintiffs propose, there would be no need to "preserve" linkages, because ICE would not be disassembling the EID's data tables and reassembling them in a different, aggregated structure. To note just one example, the "CSE" table assigns every case a "unique identifier" called the "CSE_ID." *See* Dkt. 47-16 at 3. When a particular case's "CSE_ID" appears in a row in another EID table, it is plainly evident from looking at the table that the records in that row relate to that case. In other words, simply copying the requested tables would satisfy Plaintiffs' request that ICE preserve relational information, without any additional effort required on ICE's part.

Mr. Gibney does not dispute that copying and producing individual tables would preserve relational information. He instead states that "the data fields used to preserve … linkages would

end up being redacted." Dkt. 51-1 ¶ 10. But even if ICE is entitled to redact identifiers like the "CSE_ID," the Second Circuit has made clear that FOIA requires ICE to preserve the linking *function* of that unique identifier and that one way of doing so would be to substitute a different, randomly produced identifier that could appear in place of the case's (purportedly exempt) "CSE_ID." *See ACLU Immigrants' Rights Project v. ICE*, 58 F.4th 643, 655–57 (2d Cir. 2023). ICE has not claimed that making such substitutions would be burdensome, and it has elsewhere conceded that doing so would be feasible. *See id.* at 662. The Second Circuit, moreover, has observed that "federal and state government agencies frequently use Unique IDs or other anonymized identifiers in producing records in other contexts," *id.* at 648 n.4, and there is record evidence that ICE has engaged in a similar practice in the past, *see* Dkt. 47-18 at 1 (FOIA response explaining that ICE had "added a column to each table … which contains a random number" that could be used "to track information about a particular alien across … various tables").

For similar reasons, ICE's contention that the EID is not structured to allow queries for records that are all related to a specific person, Dkt. 51 at 7–8, would be beside the point even if it were true. If ICE were to copy and produce the relevant EID tables instead of attempting to aggregate all responsive records into a single spreadsheet, Plaintiffs could themselves use existing identifiers like the "CSE_ID" (or substitutes thereof) to connect the records that are related to the same individual. In any event, ICE has repeatedly represented that it *can* organize EID data in a person-by-person manner. *See* Dkt. 47-1 at 9–10. ICE's only answer to this evidence is that it uses computer applications to perform this function. Dkt. 51 at 7–8; *see* Dkt. 51-3 at 2 (explaining that agency personnel "create, modify, and access the data stored in the EID's central data repository using different … applications"). But ICE offers neither reasoning nor precedent to explain why this point matters. The undisputed fact remains that ICE *can* use its existing capabilities to pull

person-by-person or case-by-case data out of the EID, whether it does so "directly through the EID" or "through other applications." Dkt. 51 at 7.

In the end, ICE reverts to atmospherics, emphasizing that Plaintiffs seek "*thousands of data fields pertaining to millions of individuals.*" *Id.* at 6. For one thing, though, these numbers are not inherently unwieldy. *See* Dkt. 47-1 at 13 (explaining that the requested records can fit on an inexpensive portable hard drive weighing under two pounds); Dkt. 47-13 ¶¶ 21–22 (describing a routine ICE release of person-by-person data related to over 3 million individuals). In addition, if ICE copied and produced individual EID tables a few at a time, it could make a series of limited releases rather than a single enormous release. This possibility belies ICE's claim that producing the records "would cause significant interference with the operation of [its] automated information system." Dkt. 51 at 8 (quoting 6 C.F.R. § 5.4(i)(1)). ICE offers an undifferentiated citation to the entirety of Mr. Gibney's initial 23-page declaration to support this claim, *id.* at 9, but ICE presumably means to refer to the passage where Mr. Gibney, despite lacking "much personal experience" on the topic, states his "understanding" that it would take over twenty days to upload the requested records to the SecureRelease Portal that ICE "typically" uses to transfer files to FOIA requesters, during which time other users might experience delays. Dkt. 40-3 ¶ 53. Even setting aside evidence that ICE sometimes uses physical media, rather than the SecureRelease Portal, to transfer large files, *see* Dkt. 47-13 ¶ 21, Mr. Gibney's belief about the time and resources involved in the transfer relies on his assumption that the records will be transferred all at once as a single, extraordinarily large file. ICE has produced no evidence that a series of transmissions of small batches of individual EID tables would interfere with its systems.[4]

_____

[4] ICE continues to overstate the size of the overall production in any event. As Plaintiffs have explained, the EID's data dictionary, which ICE released in a separate litigation, reflects that the EID contains 849 tables, no more than 399 of which are data tables. Dkt. 47-13 ¶¶ 11–14. Mr.

There is no dispute, then, that ICE can feasibly begin to copy and transmit individual EID tables, starting with the "CSE" table (which has just 32 fields) and moving to the tables that are directly and indirectly linked to the "CSE" table through its six already-disclosed linkage fields. *See* Dkt. 47-16. Accordingly, this Court should order ICE to do so.

ICE resists this result by stating that it has no duty to produce *any* records if it believes that honoring Plaintiffs' request in full would be unduly burdensome. Dkt. 51 at 9. This contention contradicts FOIA's requirement that "[a]n agency shall … consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible." 5 U.S.C. § 552(a)(8)(A)(ii)(I). ICE states that this requirement "only applies where an agency invokes a FOIA exemption or disclosure is prohibited by law." Dkt. 51 at 9. But ICE cites no support for this atextual claim, and it appears to be mistakenly referencing a *separate* provision of 5 U.S.C. § 552(a)(8) that authorizes an agency to withhold portions of records under certain circumstances. *See* 5 U.S.C. § 552(a)(8)(A)(i). Indeed, as Plaintiffs have explained, *see* Dkt. 47-1 at 14, the Second Circuit has previously responded to an agency's burdensomeness claim by suggesting that the district court should direct the agency to start producing the highest-priority records according to a specified timetable. *See N.Y. Legal Assistance Grp. v. BIA*, 987 F.3d 207, 225 (2d Cir. 2021). ICE maintains that this precedent has no bearing here because it involved

---

Gibney attempts to cast doubt on these figures by referring to an additional production that ICE made in September 2024 that contains 230 tables. Dkt. 51-1 ¶ 14. The production in question is a document that ICE calls the "EARM Schema," *Long v. ICE*, 1:22-cv-02655 (D.D.C.), Dkt. 31 ¶ 3 (filed Sept. 18, 2024), and it appears to identify a subset of EID tables that are integrated into the ENFORCE Alien Removal Module, a separate "case management tool," Dkt. 50-2 at 4. But even assuming that none of the 230 tables listed in the "EARM Schema" are duplicative of any of the 849 tables listed in the EID data dictionary, that all 230 tables are part of the EID despite not appearing in its data dictionary, and that all 230 tables are data tables rather than code tables, the EID contains at most 629 data tables. Even this generous estimate is flatly inconsistent with Mr. Gibney's claim that the EID contains "over 1,000 data tables." Dkt. 40-3 ¶ 13.

records that were sought pursuant to a different provision of FOIA, Dkt. 51 at 9, but it does not explain why the analysis of the agency's burdensomeness defense would be any different in that context, and the Second Circuit proceeded on the understanding that it would not be. *See N.Y. Legal Assistance Grp.*, 987 F.3d at 225 n.28.

In sum, ICE's claimed burdensomeness defense cannot defeat Plaintiffs' showing that they are entitled to partial summary judgment.

**B. There is no dispute that segregable portions of the requested records, including the "CSE" table, can be produced without harming an interest protected by FOIA's exemptions.**

ICE's only other claimed justification for refusing to produce any records in response to Plaintiffs' FOIA request is that the requested records contain information that is exempt from disclosure under FOIA. Plaintiffs do not dispute that portions of the records may be exempt and so may properly be redacted. Indeed, Plaintiffs have even preemptively agreed not to challenge certain redactions. *See* Dkt. 40-7 at 2. But ICE carries the burden of establishing that the exempt parts of the requested records cannot reasonably be segregated from the nonexempt parts, *see ACLU Immigrants' Rights Project*, 58 F.4th at 654, and there is no genuine dispute that ICE can— and indeed regularly does—release segregable portions of the requested records without "harm[ing] an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). ICE's broad invocation of various exemptions accordingly cannot support its decision to produce *nothing*.

**1. ICE can undisputedly produce records that do not contain sensitive personal information without harming the privacy or safety interests of Exemptions 6, 7(C), and 7(F).**

ICE first repeats its argument that personal privacy or safety concerns justify withholding all responsive records pursuant to Exemption 6 (which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal

privacy," 5 U.S.C. § 552(b)(6)), Exemption 7(C) (which protects law-enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7)(C)), and Exemption 7(F) (which protects law-enforcement records that "could reasonably be expected to endanger the life or physical safety of any individual," *id.* § 552(b)(7)(F)). *See* Dkt. 51 at 10–13. As ICE notes, its foundation for invoking each of these exceptions is its "concern that a variety of vulnerable individuals could be reidentified" if the records were released. *Id.* at 10. ICE, however, must show not only that reidentification is a theoretical possibility, but also that ICE "reasonably foresees" that disclosing the records—even if properly redacted—"*would harm*" the interests protected by the exemptions that it invokes. 5 U.S.C. § 552(a)(8)(A)(i)(I) (emphasis added). ICE has not carried its burden of doing so.

To begin with, ICE fails to support the underlying premise of its argument—namely, that reidentification inherently threatens an individual's privacy or safety even if potentially sensitive information, such as health information or status as a sexual minority, is redacted from the associated records. *See* Dkt. 47-1 at 18–19. And ICE has similarly produced no evidence of a genuine risk that malevolent actors are both equipped and motivated to wade through large volumes of anonymous government records from which sensitive information has been stripped, solely to reverse-engineer a person's identity and associate that person with non-sensitive data. ICE attempts to plug this gap by pointing to evidence that researchers tasked with doing so were able to reidentify individuals based on unspecified "EID data," Dkt. 51 at 10 (citing Dkt. 40-8 ¶ 44), or unspecified "demographic … identifiers," *id.* at 11 (quoting Dkt. 40-8 ¶ 11(a)). But the mere possibility that a technically savvy malfeasant *could* elect to do the same is not the same as a reasonably foreseeable risk that he or she *will* do so and will cause resultant harm.

ICE tries to dilute the relevant legal standard by arguing that "theoretical or hypothetical concerns" are sufficient grounds for withholding records pursuant to a FOIA exemption. *Id.* The only case that it cites for this proposition, however, predates Congress's introduction of FOIA's "reasonably foreseeable harm" requirement by nearly 30 years. *See id.* (citing *Keys v. DOJ*, 830 F.2d 337, 346 (D.C. Cir. 1987)). Congress created that requirement in 2016 precisely to address concerns that agencies were overusing FOIA exemptions. *See Seife*, 43 F.4th at 235.

ICE's own past practices, moreover, confirm that its stated reidentification concerns are purely theoretical. As Plaintiffs have explained, ICE regularly produces vast swathes of unredacted person-by-person data. *See* Dkt. 47-1 at 21–22. ICE dismisses this undisputed fact as irrelevant because the records in this case contain a greater amount of data than the records that ICE has previously released. Dkt. 51 at 12–13. According to ICE, though, the quantity of person-specific data in the records that it regularly releases would *already* permit reidentification. *Compare* Dkt. 40-8 ¶ 11(a) (ICE declaration stating that "only 15 basic demographic indirect identifiers" are typically needed for reidentification) *and id.* ¶ 44 (ICE declaration stating that "detention dates[] provid[e] key information" that assists in reidentification), *with* Dkt. 47-21 (describing FOIA release of records for over 3 million people, with 78 unredacted data fields such as "Apprehension Date" and "Initial Book In Date [and] Time" for each person) *and* Dkt. 47-23 (describing FOIA release of records for over 1.7 million people, with 124 data fields—again including fields with detention details—connected to each person). ICE has not even attempted to explain why releasing the requested records would create a meaningful incremental increase in reidentification risk, given that reidentification is already apparently possible for motivated parties.

ICE also makes no effort to carry its burden of establishing "what proportion of the information" in the requested records is personally identifying and whether that information is

"dispersed throughout" the records in a way that would make redaction impractical. *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977). ICE emphasizes that, by its count, the EID contains "12,000 fields of data," Dkt. 51 at 12, but it does not dispute that many of these fields appear in code tables, rather than data tables, and accordingly do not pertain to a particular individual at all, *see* Dkt. 47-1 at 20. Even among data tables, ICE has not disputed Plaintiffs' contention that some tables—including the "CSE" table—contain no personal information. *See id.* at 20–21. Indeed, ICE does not even dispute that "most of the EID's fields relate to the *government's* activities and not to the identities or characteristics of individuals," *id.* at 20, although it does dispute the adequacy of Plaintiffs' evidence on this contention, Dkt. 51 at 12. Again, though, it is ICE's burden to demonstrate that exempt material is *not* segregable, *see Mead Data Central*, 566 F.2d at 261, not Plaintiffs' burden to demonstrate that it is.

The only evidence that ICE cites to support its position on segregability is a sentence from an agency declaration that states that it would be "technically infeasible, if not practically impossible," to fully "anonymiz[e]" the records that Plaintiffs seek. Dkt. 51 at 18 (quoting Dkt. 40-8 ¶ 13). Again, though, ICE's regular public releases establish that ICE does not reasonably foresee that datasets that are not fully anonymized will cause harm to personal privacy or safety. ICE has not explained why it is incapable of redacting sensitive information, as it has done in the past, to ensure that *if* reidentification were to occur (as it already apparently can), the data connected to the reidentified person would not be of the sort that raises privacy or safety concerns.[5] And ICE has not explained whether the EID contains other data tables like the "CSE" table that do not contain personally identifying information and thus undisputedly can be released.

---

[5] At least with respect to the privacy-based Exemptions 6 and 7(C), moreover, any such concerns must be balanced against the public interest in disclosure. Dkt. 47-1 at 22–23. ICE does not and

**2. ICE can undisputedly produce EID data and certain metadata without harming the law-enforcement interests of Exemptions 7(A) and 7(E).**

ICE next renews its argument that law-enforcement concerns justify withholding all responsive records pursuant to Exemption 7(A) (which protects law-enforcement records that "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A)) and Exemption 7(E) (which protects law-enforcement records that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law," *id.* § 552(b)(7)(E)). *See* Dkt. 51 at 14–16. Specifically, ICE claims to be concerned that producing the requested records could increase the risk of a cyberattack on the EID.[6] *Id.* at 14. As Plaintiffs have explained, Dkt. 47-1 at 26–28, ICE's concern appears to boil down to the fear that a would-be hacker could use information about the EID (much of which is already known) to create a sort of training ground for planning attacks that could be executed in the event that the hacker is somehow able to break into ICE's computer system. This speculative concern cannot justify ICE's refusal to produce *any* records.

To begin, ICE's evidence is insufficient to establish that ICE "reasonably foresees" that any additional information that the requested records would reveal about the EID would make a meaningful incremental improvement to a hacker's ability to plan an effective attack, given the information that is already available. 5 U.S.C. § 552(a)(8)(A)(i)(I); *see* Dkt. 47-1 at 26–29

---

could not dispute that Plaintiffs' compilation and analysis of data related to ICE's activities are widely relied on by journalists, lawyers, scholars, and government bodies. *See* Dkt. 46-7 ¶¶ 3–4.

[6] ICE also reiterates its concern that the records could hamper enforcement efforts by revealing witness and prosecutor information. Dkt. 51 at 14. These arguments fail for the same reason that ICE's other reidentification arguments fail, *see supra* pp. 10–13, and they fail for the further reason that ICE has not shown why witness and prosecutor details—as distinct from details about the subjects of ICE's enforcement actions—cannot reasonably be segregated and redacted if necessary.

(explaining that many of the EID's code translations, primary and foreign keys, and data-type descriptions are either known or readily inferable based on existing sources). ICE cites to language from one of its declarations stating broadly that releasing the requested records could present "an increased likelihood of targeted cyberattacks," Dkt. 51 at 14 (quoting Dkt. 40-2 ¶ 32), but it does not explain *why* this is so. Indeed, the cited passage from the declaration appears to voice concern about exposing "potential weak points" that could enable "[c]yber breaches" despite ICE's "robust security measures." Dkt. 40-2 ¶ 32. ICE, however, has not disputed Plaintiffs' contention that "knowing the contents of the EID would [not] aid a bad actor in *accessing* the EID." Dkt. 47-1 at 27. And although ICE emphasizes that it has "provided half a dozen types of cybersecurity attacks that have *actually* occurred," Dkt. 51 at 15, Plaintiffs do not dispute that cyberattacks occur. What ICE has failed to show is that the information Plaintiffs seek will make a cyberattack *more likely*.

Even putting this point aside, however, ICE has not disputed that large portions of the requested records can be released without even arguably implicating its cybersecurity concerns. As Plaintiffs have explained, Dkt. 47-1 at 29, ICE witnesses in prior cases have stated that the agency's purported concerns arise from the release of *metadata*, not the underlying immigration records. Rather than challenging this point, ICE maintains that Plaintiffs' request raises the same concerns because it would "reveal[] the organization and structure of the EID." Dkt. 51 at 16 n.8. ICE's prior releases, though, make clear that ICE does not foresee that *all* disclosures—including disclosures of metadata that reveal aspects of database structure—will harm cybersecurity. *See* Dkt. 47-1 at 26–29. At minimum, ICE has not disputed that the "CSE" table's linkage fields are already known, *see* Dkt. 47-16, such that the table can undisputedly be released without revealing any new information about database structure. More broadly, ICE's own declarant concluded that, at most, his purported cybersecurity concerns would justify "withholding [specified] details" about

15

the EID. Dkt. 40-2 ¶ 41; *see id.* ¶ 29 (opining that honoring Plaintiffs' FOIA request would present "the issue of fields that would need to be redacted"). In its initial brief, ICE did not even attempt to argue that the information that it claims poses a risk to cybersecurity could not reasonably be segregated and redacted. *See* Dkt. 40-1 at 34–38 (arguing only that reidentification risks cannot be mitigated by segregating exempt records). ICE now devotes three sentences to making this argument, *see* Dkt. 51 at 18, but, again, ICE's own past practices belie this belated claim.[7]

### 3. ICE has not identified any EID records that are specifically exempted from disclosure by an Exemption 3 statute.

Finally, ICE briefly repeats its claim that it can withhold all responsive records pursuant to Exemption 3, which permits an agency to withhold records that are "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). ICE complains that Plaintiffs have not "analy[zed] … any of the statutes cited by ICE" in support of its Exemption 3 argument, Dkt. 51 at 16, but it is ICE that must establish that Exemption 3 applies by demonstrating that "(1) the statute invoked qualifies as an Exemption 3 withholding statute, and (2) the materials withheld fall within that statute's scope." *Bloomberg L.P. v. U.S. Postal Serv.*, 118 F.4th 307, 315 (2d Cir. 2024) (quoting *Spadaro v. CBP*, 978 F.3d 34, 42 (2d Cir. 2020)). Plaintiffs pointed out that ICE's initial brief made no attempt to make either showing, Dkt. 47-1 at 33–35, and ICE's reply does not correct that fatal deficiency. Indeed, ICE admits that it has "not yet" identified any records that are supposedly subject to the statutes "implicated" by Plaintiffs' request. Dkt. 51 at 16–17. ICE's inchoate

---

[7] ICE also does not dispute that Exemption 7(A) pertains only to pending or imminent enforcement proceedings, *see* Dkt. 47-1 at 30, such that it would not be implicated by records related to *closed* cases, *see id.* at 32. ICE simply states that information on closed cases "cannot be so easily segregated." Dkt. 51 at 17. This *ipse dixit*, unsupported by any evidence, is insufficient to carry ICE's burden of establishing an inability to segregate, especially given Plaintiffs' unrebutted evidence that the "CSE" table can be filtered to exclude active cases. *See* Dkt. 47-1 at 32.

concerns that exempt material might exist somewhere in the EID cannot justify ICE's refusal to immediately begin releasing undisputedly nonexempt records, such as the "CSE" table.

## II.   In the alternative, this Court should order ICE to respond to Plaintiffs' discovery demands.

While the existing record establishes Plaintiffs' entitlement to partial summary judgment against ICE, it bears noting that ICE has refused to produce any discovery whatsoever in response to the discovery demands that Plaintiffs served on ICE with Magistrate Judge Dancks's permission on October 31, 2024. *See* Dkt. 54-1. As an alternative to granting Plaintiffs partial summary judgment, this Court has discretion to order ICE to engage in the discovery process so that this Court can revisit the issue of summary judgment on the basis of a developed record.[8]

ICE emphasizes that "[c]onclusory allegations" are insufficient to justify discovery in a FOIA case. Dkt. 51 at 20 (quoting *CareToLive v. FDA*, 631 F.3d 336, 346 (6th Cir. 2011)). But Plaintiffs have produced "tangible evidence"—including ICE's own prior productions—that, at a minimum, cast significant doubt on ICE's contention that no responsive records can feasibly be produced and that, accordingly, "justify discovery" under the Second Circuit's precedents. *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994); *see also Cox v. DOJ*, 111 F.4th 198, 213 (2d Cir. 2024) (observing that while evidence of an agency's bad faith can be sufficient to justify discovery, such a showing is not necessary). As described extensively above, Plaintiffs have produced evidence that copying and producing EID data is not only feasible but routine, *see supra* p. 5, that copying

---

[8] Plaintiffs have explained why ICE is not entitled to summary judgment, *see* Dkt. 47-1 at 6–35, and ICE's reply arguments in support of its summary judgment motion fail for the same reason that ICE's arguments in opposition to Plaintiffs' cross-motion for partial summary judgment fail. But if this Court declines to grant partial summary judgment in Plaintiffs' favor at this time, then it should determine whether Plaintiffs are entitled to discovery responses before ruling on ICE's summary judgment motion. After all, if Plaintiffs are entitled to further develop the record, then the question whether the existing record supports summary judgment for ICE is immaterial.

and producing individual EID tables, such as the "CSE" table, would be a possible means of complying with Plaintiffs' FOIA request, *see supra* pp. 6–8, that ICE regularly produces vast quantities of person-specific data from the EID without raising reidentification concerns, *see supra* p. 12, that ICE has admitted that the release of data, rather than metadata, does not implicate its claimed cybersecurity concerns, *see supra* p. 15, and that ICE has even released large amounts of EID metadata without creating any identifiable harm to cybersecurity, *see supra* pp. 14–15.

Meanwhile, even a quick skim of the discovery demands that Plaintiffs have served on ICE, *see* Dkt. 47-10; Dkt. 47-11; Dkt. 47-12, makes clear that the demands do not represent an effort to "short circuit the FOIA process." Dkt. 51 at 20. Not a single one of Plaintiffs' demands seeks the release of responsive records that have not already been publicly produced. Rather, each demand seeks information that will enable Plaintiffs to probe the validity of ICE's claimed defenses. For example, in response to ICE's burdensomeness defense, Plaintiffs seek information about the volume of the requested records or of a possible partial production based on the "CSE" table, *see* Dkt. 47-10 Nos. 2–5; Dkt. 47-11 Nos. 4–5; Dkt. 47-12 No. 1, ICE's ability to copy a single EID table, with appropriate redactions, *see* Dkt. 47-10 Nos. 6, 21; Dkt. 47-11 Nos. 2–3; Dkt. 47-12 Nos. 4, 8, ICE's ability to produce person-by-person records, *see* Dkt. 47-10 Nos. 11–14; Dkt. 47-11 No. 10; Dkt. 47-12 No. 6, and ICE's ability to transmit large files without degrading system performance, *see* Dkt. 47-10 Nos. 7–9, 15; Dkt. 47-11 Nos. 11–12; Dkt. 47-12 No. 7. In response to ICE's claimed reidentification concerns, Plaintiffs seek information about the amount and distribution of sensitive or potentially identifying personal information within the EID, *see* Dkt. 47-10 No. 18; Dkt. 47-11 Nos. 6–9; Dkt. 47-12 No. 2, the nature of ICE's prior productions of unredacted person-specific data, *see* Dkt. 47-10 No. 13; Dkt. 47-11 No. 14; Dkt. 47-12 Nos. 9–12, and ICE's processes for mitigating reidentification concerns, *see* Dkt. 47-10 Nos. 16–17, 20;

18

Dkt. 47-11 No. 13. Finally, in response to ICE's claimed concerns about releasing law-enforcement information or creating a cybersecurity risk, Plaintiffs seek information about the volume and distribution of law-enforcement information within the EID, *see* Dkt. 47-10 No. 19, the nature of ICE's prior releases of supposedly compromising metadata, *see id.* Nos. 10, 22–24; Dkt. 47-11 No. 15; Dkt. 47-12 Nos. 13–14, and the possibility of releasing the "CSE" table without implicating any of ICE's claimed concerns, Dkt. 47-12 Nos. 3, 15. All of these areas of inquiry are plainly and directly relevant to ICE's defenses, and ICE has not argued otherwise.

ICE also objects that Plaintiffs' demands are supposedly of insufficiently "limited scope," Dkt. 51 at 20, but again, the demands are closely focused on factual issues that ICE itself has put at issue through its claimed defenses. In any event, ICE's objections to the scope of the discovery are premature. As Plaintiffs have explained to Magistrate Judge Dancks, "[b]ecause of the parties' fundamental disagreement over whether ICE … [is] required to produce *any* discovery in this case, the parties have not considered whether they may be able to amicably resolve any of [ICE's] objections … toward specific items within Plaintiffs' discovery demands." Dkt. 52 at 2. Once this Court has resolved the question whether ICE must participate in the discovery process at all, ICE can raise any objections it has to particular discovery requests, and the parties can work to resolve any such discrete disputes consensually or, if necessary, with the assistance of Magistrate Judge Dancks. ICE's generalized complaint about the scope of the discovery demands, in other words, does not justify its refusal to produce any discovery at all.

Finally, ICE suggests that it should be permitted to supply "supplemental submissions" in lieu of discovery. Dkt. 51 at 20. But ICE had every incentive to support its claimed defenses with sufficient evidence the first time around, and courts that have taken ICE's proposed course have expressed frustration with the "burden" that this type of "iterative process" places "on the time

19

[and] resources of all involved" and have noted that "it is at odds with the statutory design, which attempts to foster expedition." *Akel v. DOJ*, No. 20-cv-03240, 2024 WL 939974, at *2 (D.D.C. Mar. 4, 2024); *see, e.g.*, *Families for Freedom v. CBP*, 837 F. Supp. 2d 331, 337 (S.D.N.Y. 2011) ("After nearly two years of inadequate searches, six sworn declarations, numerous letters and briefs and in-person conferences, the Court's patience has worn out."). To the extent that this Court is not inclined to grant partial summary judgment for Plaintiffs on the existing record, the efficient course would be to order the discovery necessary to create a full evidentiary record regarding ICE's claimed defense once and for all, rather than setting up the parties and the Court for recurring and unnecessary cycles of summary judgment briefing and rulings.

## CONCLUSION

This Court should grant partial summary judgment in favor of Plaintiffs and against ICE and order ICE to begin producing responsive records that can undisputedly be feasibly produced and that are undisputedly not subject to a FOIA exemption. In the alternative, this Court should order ICE to respond to Plaintiffs' discovery demands and defer ruling on summary judgment until the parties have had the opportunity to supplement the record.

Dated: January 16, 2025                    Respectfully submitted,

                                           /s/ Nicolas A. Sansone
                                           Nicolas A. Sansone (admitted pro hac vice)
                                           Michael T. Kirkpatrick (admitted pro hac vice)
                                           Public Citizen Litigation Group
                                           1600 20th Street NW
                                           Washington, DC 20009
                                           (202) 588-7714
                                           nsansone@citizen.org

                                           *Counsel for Plaintiffs*